UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

RONALD KENNETH NORFLEET,

                Petitioner,

                                    Case No. 2:21-cv-12

v.

                                    Honorable Robert J. Jonker

JAMES CORRIGAN,

                Respondent.

_____/

## OPINION

    This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Ronald Kenneth Norfleet is incarcerated with the Michigan Department of Corrections at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. On June 3, 2015, following a four-day jury trial in the Grand Traverse County Circuit Court, Petitioner was convicted of one count of maintaining a drug house and one count of maintaining a drug vehicle, in violation of Mich. Comp. Laws § 333.7405, one count of possession with intent to deliver less than 50 grams of heroin, in violation of Mich. Comp. Laws § 333.7401(2)(a)(iv), three counts of delivery of less than 50 grams of heroin, in violation of Mich. Comp. Laws § 333.7401(2)(a)(iv), and one count of conspiracy to deliver less than 50 grams of heroin, in violation of Mich. Comp. Laws § 333.7401(2)(a)(iv) and Mich. Comp. Laws § 750.157a. On June 26, 2015, the court sentenced Petitioner as a fourth-offense habitual offender, Mich. Comp. Laws § 769.12, to prison terms of 11 years, 2 months to 40 years on each of the possession or delivery counts and 3 years, 10 months to 15 years on the counts for maintaining a drug house and a drug vehicle. The court ordered the delivery and possession counts to be served consecutively.

On January 15, 2021, Petitioner filed a "motion to hold habeas petition in abeyance." (ECF No. 1.) Petitioner indicated that he wanted to hold any § 2254 proceedings in abeyance until he could exhaust certain claims for relief in the state courts. This Court directed Petitioner to file an amended § 2254 petition in an order (ECF No. 6) entered on March 1, 2021. Petitioner filed his amended petition (ECF No. 7) on March 17, 2021.

In an opinion and order (ECF Nos. 8, 9) entered on March 25, 2021, the Court denied Petitioner's motion to stay proceedings and hold them in abeyance. The Court also directed Petitioner to show cause within 28 days why his petition should not be dismissed as untimely. Petitioner filed his show cause response (ECF No. 10) on April 20, 2021. In an order (ECF No. 11) entered on May 5, 2021, the Court noted that it could not determine whether Petitioner was entitled to equitable tolling of the statute of limitations without a response from Respondent. (*Id.*, Page209.) The Court noted further that Petitioner's actual innocence claim could suffice to avoid a timeliness bar, but that his claim of actual innocence was unexhausted. (*Id.*) The Court, therefore, stayed these proceedings and administratively closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims. (*Id.*, PageID.210–211.)

On January 5, 2023, Petitioner returned to this Court with a motion to amend his § 2254 petition. (ECF No. 12.) In an order (ECF No. 13) entered on March 14, 2023, the Court lifted the stay, granted Petitioner's motion, and directed the filing of his second amended petition (ECF No. 14). Petitioner's second amended petition, however, raises only three issues—the issues Petitioner raised in the state courts while these § 2254 proceedings were stayed. The Court, therefore, has construed Petitioner's second amended petition to be a supplement to his first amended petition.

2

When both amended petitions are considered, Petitioner raises the following fifteen grounds for relief:

I.      Mr. Norfleet is entitled to resentencing where his de facto life offense without the possibility of parole for 56 years is disproportionate to . . . offense and violates the federal and state constitutional prohibitions against cruel and unusual punishment.

II.     Offense Variable 12 was misscored where the record contains no proof that . . . [felonious] criminal acts occurred within 24 hours of the sentencing offenses, U.S. Const. Am. VI; Mich. Const. 1963 Art I § 20 and trial counsel was ineffective for failing to object to the absence of evidence supporting the scoring variable.

III.    Trial counsel was ineffective when he failed to move for a mistrial when the jury heard the Defendant-Appellant state in a recorded jail phone call that his bond was $75[0],000 because of his prior murder conviction and violent past.

IV.    The Trial Court erred and abused it[s] discretion when it failed to fairly present the issues to be tried and trial counsel was ineffective for failure to know the law and request the additional clarifying jury instructions.

V.     Defendant-Appellant['s] constitutional right to due process of law, US Const. Am. XIV; Mich Const. 1963 Art. I § 17, was violated when the evidence of possession of heroin with intent to deliver was illegally insufficient to convict him of that offense at trial.

VI.    The trial court abused its discretion and violated Defendant-Appellant's right to be sentenced based upon accurate information when it refused to remove a reference to Young Boys Inc. and a juvenile adjudication in the PSIR.

VII.   APPELLANT NORFLEET WAS DENIED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL (US CONST. AM. VI; CONST. 1963 ART. I § 20), AND HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL (US CONST. AM. V, VI , XIV; CONST. 1963 ART. I §§ 17, 20), WHERE COUNSEL FAILED TO SEEK SUPPRESSION OF ILLEGALLY SEIZED EVIDENCE, PLUS EVIDENCE AND INFORMATION OBTAINED INCIDENTAL TO THE SEARCH OF 802 INDIAN TRIAL BLVD, AND THE ARREST OF MR. NORFLEET, WHERE THE AFFIDAVIT FILED IN SUPPORT OF THE SEARCH AND ARREST AT HIS RESIDENCE WAS SO LACKING IN INDICIA

3

OF PROBABLE CAUSE [I.E. BARE-BONE AFFIDAVIT] LACKED PROBABLE CAUSE, CONTAINS NO FACTUAL COMPONENTS WHICH WOULD ESTABLISH A MINIMALLY SUFFICIENT NEXUS BETWEEN THE NERG'S DRUG-DISTRIBUTION ACTIVITY OUT OF MOTEL ROOM 112, AND MR. NORFLEET RESIDENCE OR THE .BLACK JEEP GRAND CHEROKEE, AND WAS BASED ON UNREASONABLE SUSPICIONS, BELIEFS AND CONCLUSIONS THAT (TNT) CONTROLLED DRUG BUY FUNDS AND OR DRUG ACTIVITY WAS GOING ON AT THE RESIDENCE OR BEING TRANSPORTED NERGS, THAT A REASONABLE LAWYER WOULD HAVE SOUGHT TO SUPPRESS THE ILLEGALLY OBTAINED EVIDENCE ON THE FACE OF THE BUSH AFFIDAVIT ALONE OR AFTER HEARING TESTIMONY FROM THE PRELIMINARY EXAMINATION, MINIMALLY, A HEARING MUST BE ORDERED ON THESE POINTS.

VIII. CRITICAL ILLEGALLY SEIZED AND OBTAINED EVIDENCE SHOWS THAT THE SUBSTANTIAL PRESENTATION OF CONSPIRACY TO, POSSESS AND MAINTAINING A DRUG [HOUSE] EVIDENCE DURING SEVERAL TRIAL DAYS EVIDENCE CONSISTENTLY EMPHASIZED BY THE PROSECUTION AS DETERMINATIVE OF GUILT, AND AS THE PRIMARY EVIDECNE [sic] ESTABLISHING DELIVERY, POSSESSION AND MAINTAINING DRUGS (HEROIN), AND RELIED ON BY THE JURY AS SUCH, BY POLICE WITNESSES TOUTED BY THE PROSECUTION AS DRUG TRAFFICKING EXPERTS, WHERE THIS EVIDENCE WAS ILLEGALLY SEIZED DENIED APPELLATE [sic] NORFLEET HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS (US CONST. AM. V; CONST. 1963 ART. I § 17).

IX. ALTERNATIVELY, IF THAT COURT FINDS THAT THE BUSH AFFIDAVIT AND THE PRELIMINARY TESTIMONY WAS AVAILABLE TO THE DEFENSE TO REQUEST A *FRANKS* HEARING PRIOR TO OR DURING TRIAL THEN APPELLANT NORFLEET WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE FEDERAL AND STATE[] CONSTITUTIONS (US CONST. AM. VI; CONST. 1963 ART. I § 20).

X. APPELLANT NORFLEET WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS (US CONST. AM. V; CONST. 1963 ART. I § 17), WHEN THE PROSECUTION ARGUED FACTS NOT IN EVIDENCE TO CONVICT, THUS, PLACING THE PROSECUTION['] S OFFICE BEHIND THE STATE CASE AND PORTRAYING TO THE JURORS

THAT HE KNEW MORE ABOUT THE CASE THAN WHAT WAS PRESENTED TO THEM (US CONST. AM. IV; CONST. 1963 ART. I §17, 20).

XI.   APPELLANT NORFLEET WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS (US CONST. AM. VI; CONST. 1963 ART. I § 20), WHERE HIS DIRECT APPEAL COUNSEL FAILED TO RAISE CRITICAL ISSUES WHICH WOULD HAVE BEEN OUTCOME DETERMINATIVE ON APPEAL.

XII.   THIS COURT SHOULD ASSESS[] AND CONSIDER OFFICER BUSH'S AFFIDAVIT AND THE PRELIMINARY EXAMINATION TESTIMONY, IN RULING ON HIS MOTION FOR RELIEF FROM JUDGMENT.

XIII.   Actual innocence: Ronald Norfleet is entitled to relief from judgment on the basis of newly discovered evidence which shows misconduct and that Norfleet is actually innocent.

XIV.   [Petitioner was] denied [his] constitutional right to due process [when the] (TNT) Traverse City Narcotic[s] Team under the leadership of Randy Graham suppressed/withheld evidence of a key witness. The evidence was exculpatory and material resulting in a *Brady* violation.

XV.   Motion to take judicial notice of Randy Graham's misconduct and misconduct suit in another case.

(Am. Pet., ECF No. 7, PageID.52–54; 2nd Am. Pet., ECF No. 14, PageID.328–331.)

On March 1, 2024, Respondent filed a motion to dismiss Petitioner's § 2254 petition as untimely. (ECF No. 16.) Respondent also filed the state court record. Petitioner has not filed a response to the motion, and the time for him to do so has expired. For the following reasons, the Court will grant the motion to dismiss and dismiss Petitioner's § 2254 petition as untimely.

## <u>Discussion</u>

## I.   **Factual Allegations**

The Michigan Court of Appeals described the events underlying Petitioner's convictions as follows:

[Petiitoner] was charged with and convicted of seven drug-related offenses. The charges were based on activities conducted by [Petitioner] in concert with two other individuals, Bryan and Alysha Nerg, and several of the sales involved Angela Bembeneck. Officers observed Alysha delivering what they believed to be heroin to Bembeneck on February 13, 2015. Bembeneck and Alysha both testified at trial that Bembeneck had ordered the heroin by calling [Petitioner], who in turn called Alysha and told her to make the delivery. Officers conducted a traffic stop on Bembeneck shortly after the suspected exchange.[1] Bembeneck consented to a search and admitted to the officer who pulled her over that she had heroin in her possession. Bembeneck then agreed to serve as a confidential informant and, on police direction, called [Petitioner] to order more heroin. Alysha testified that [Petitioner] called her to have her deliver more heroin to Bembeneck. Bembeneck made the purchase with "controlled buy funds" provided by the police and received heroin from Alysha in exchange for those funds. In addition to these two exchanges, Bryan testified that, on the same date, he delivered cash to [Petitioner], who was in his Jeep, in exchange for heroin.

Following the controlled buy, search warrants were executed at both [Petitioner's] residence and the motel where Bryan and Alysha Nerg were residing. Heroin was found in the Nergs' motel room, but no heroin was found at [Petitioner's] residence or in his Jeep. Police testified that a search of [Petitioner's] residence revealed large amounts of cash, including the "controlled buy funds" that Bembeneck used in the exchange with Alysha, keys for a safe-deposit box, two BB gun pistols, and baggies. Officers testified that, while no heroin was found in [Petitioner's] home, a drug dog did alert to drugs at several locations in the house and that the drug dog was not able to search [Petitioner's] kitchen because an evidence tabulation station had been set up there.

[Petitioner's] ex-girlfriend, Desseray Richey, testified that, after learning that officers had searched [Petitioner's] home, she went there and took what she "suspected could have been drugs" out of the kitchen and flushed them down the toilet. Richey also testified that she had previously picked up cash and made deliveries for [Petitioner], including deliveries to the Nergs. Richey testified that [Petitioner] told her the deliveries were "protein powder," which he claimed to sell as part of his business as a personal trainer.[2]

―――――――――――――――――――――――――

1 The officer who conducted the traffic stop testified that the stop was predicated on her observance that Bembeneck was not wearing a seat belt and was driving with her license plate partially covered.

2 Richey testified that at one point she thought the substance was crack cocaine but that when she asked [Petitioner], he got upset and told her it was "dope." The parties

vigorously dispute whether Richey ever identified the substance as heroin before being told to use that word by the police and prosecution.

*People v. Norfleet*, 897 N.W.2d 195, 199–200 (Mich. Ct. App. 2016).

Jury selection for Petitioner's trial occurred on May 27, 2015. (Trial Tr. I, ECF No. 17-4.) Over the course of four days, the jury heard testimony from numerous witnesses, including the Nergs, Angela Bembeneck, Desseray Richey, law enforcement officials, and Petitioner's brother. (Trial Tr. I, II, III, & IV, ECF Nos. 17-4, 17-5, 17-6, 17-7.) On June 3, 2015, after about two hours of deliberation, the jury returned a guilty verdict. (Trial Tr. IV, ECF No. 17-7, PageID.1939–1940.) Petitioner appeared before the trial court for sentencing on June 26, 2015. (ECF No. 17-8.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals. In a counseled brief, Petitioner raised what he now asserts as habeas grounds I through VI. (ECF No. 17-16, PageID.2188–2189.) In a *pro per* supplemental brief, Petitioner raised the following claims: (1) the trial court violated the Sixth Amendment by enhancing the minimum sentencing guidelines range based upon facts found by the trial court and not the jury; (2) the prosecutor failed to timely file a notice to enhance Petitioner's sentence; (3) the prosecutor used false and perjured testimony; and (4) the prosecutor deliberately confiscated attorney work-product documents. (*Id.*, PageID.2290.)

In an opinion entered on November 8, 2016, the court of appeals affirmed Petitioner's convictions but remanded the matter for further sentencing proceedings. *Norfleet*, 897 N.W.2d at 199. The court of appeals noted that Petitioner's appeal "present[ed] an issue of first impression regarding appellate review of a trial court's decision to impose consecutive sentences when imposition of consecutive sentences was not mandatory." *Id.* The court of appeals held that when a trial court uses its discretion to impose consecutive sentences, that decision is reviewed for abuse

7

of discretion, and so the trial court is "required to articulate on the record the reasons for each consecutive sentence imposed." *Id.* The court of appeals also agreed with Petitioner that there were constitutional concerns with regard to the trial court's factual findings in support of the mandatory application of the sentencing guidelines, and the lack of record support for the trial court's determination that Petitioner was affiliated with a street gang. *Id.* at 205–207. The court of appeals remanded the matter to the trial court to address these various sentencing errors and retained jurisdiction. *Id.* at 207.

Petitioner then filed a *pro per* application for leave to appeal to the Michigan Supreme Court. The State filed an application for leave to appeal as cross-appellant. The Michigan Supreme Court denied both applications for leave to appeal on June 7, 2017. *See People v. Norfleet*, 896 N.W.2d 4 (Mich. 2017).

On June 28, 2017, the trial court conducted the remand hearing contemplated by the court of appeals. (ECF No. 17-9.) The trial court entered an amended judgment of sentence. The trial court determined that it would have imposed the same minimum sentences even if the guidelines were advisory rather than mandatory, and that the 11-year, 2 month to 40-year sentences for counts I and II should be served consecutively, but that the remaining counts would run concurrently with those sentences and each other. *See People v. Norfleet*, 908 N.W.2d 316, 318 (Mich. Ct. App. 2017). The court of appeals affirmed Petitioner's new sentences. *See id.* at 319. The Michigan Supreme Court denied Petitioner's *pro per* application for leave to appeal on July 3, 2018. *See People v. Norfleet*, 913 N.W.2d 285 (Mich. 2018).

On September 18, 2018, Petitioner filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500 in the trial court. (ECF No. 17-10.) In that motion, Petitioner raised

what he now asserts as habeas grounds VII through XII. (*Id.*, PageID.2025–2026.) The trial court denied Petitioner's Rule 6.500 motion on December 19, 2018. (ECF No. 17-12.) The court of appeals and supreme court denied Petitioner's applications for leave to appeal on September 11, 2019, and January 2, 2020, respectively. (ECF Nos. 17-17, PageID.2404; 17-20, PageID.3156.)

As noted *supra*, Petitioner initiated § 2254 proceedings in this court on January 15, 2021. In an order (ECF No. 11) entered on May 5, 2021, the Court noted that it could not determine whether Petitioner was entitled to equitable tolling of the statute of limitations without a response from Respondent. (*Id.*, Page209.) The Court noted further that Petitioner's actual innocence claim could suffice to avoid a timeliness bar, but that his claim of actual innocence was unexhausted. (*Id.*) The Court, therefore, stayed these proceedings and administratively closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims. (*Id.*, PageID.210–211.)

Petitioner, through counsel, returned to the trial court and filed a successive Rule 6.500 motion on June 6, 2021. (ECF Nos. 17-13, 17-14.) In that motion, Petitioner, through counsel, raised what he now asserts as habeas grounds XIII through XV. (*Id.*) The trial court denied Petitioner's successive Rule 6.500 motion on September 24, 2021. (ECF No. 17-15.) The court of appeals and supreme court denied Petitioner's applications for leave to appeal on May 5, 2022, and March 6, 2023, respectively. (ECF Nos. 17-18, PageID.2723; 17-21, PageID.3276). Petitioner's second amended § 2254 petition followed.

## II.    Statute of Limitations

Respondent claims that Petitioner's application is barred by the one-year statute of limitations provided in 28 U.S.C. § 2244(d)(1), which became effective on April 24, 1996, as part

9

of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214

(AEDPA). Section 2244(d)(1) provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of
>
>> (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

In most cases, § 2244(d)(1)(A) provides the operative date from which the one-year

limitations period is measured. Under that provision, the one-year limitations period runs from

"the date on which the judgment became final by the conclusion of direct review or the expiration

of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). As set forth above, after the trial

court imposed a new sentence upon remand, Petitioner appealed that new sentence to the Michigan

Court of Appeals and the Michigan Supreme Court. The Michigan Supreme Court denied

Petitioner's *pro per* application for leave to appeal on July 3, 2018. *See People v. Norfleet*, 913

N.W.2d 285 (Mich. 2018). Petitioner did not file a petition for a writ of certiorari with the United

States Supreme Court. The one-year limitations period, however, did not begin to run until the 90-

day period in which Petitioner could have sought certiorari expired. *See Lawrence v. Florida*, 549

U.S. 327, 332–33 (2007); *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000). The 90-day period expired on October 1, 2018.

Petitioner had one year from October 1, 2018, until October 1, 2019, to file his § 2254 petition. *See Moss v. Miniard*, 62 F.4th 1002, 1009–10 (6th Cir. 2023) (clarifying that "the limitations period would . . . end on the anniversary of the finality date"). Petitioner did not initiate § 2254 proceedings until January 11, 2021, when he filed his motion for a stay and abeyance. Petitioner, therefore, obviously initiated § 2254 proceedings more than one year after the limitations period began to run. Thus, absent tolling, his § 2254 petition is time-barred.

### A.    Statutory Tolling

The one-year limitations period is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *see also Duncan v. Walker*, 533 U.S. 167, 181–82 (2001) (limiting the tolling provision to only State, and not Federal, processes); *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (defining "properly filed").

Petitioner filed his first Rule 6.500 motion on September 18, 2018. (ECF No. 17-10, PageID.2062.) Those Rule 6.500 proceedings remained pending until the Michigan Supreme Court denied Petitioner's application for leave to appeal on January 2, 2020. (ECF No. 17-20, PageID.3156.) Because Petitioner filed his first Rule 6.500 motion while his time period for petitioning the United States Supreme Court for certiorari was still running, the limitations period did not begin to run until January 3, 2020, the day after the Michigan Supreme Court denied leave to appeal. Accordingly, Petitioner had one year from January 3, 2020, or up to and including January 2, 2021, to file his § 2254 petition. *See Moss*, 62 F.4th at 1009–10 (noting that "the limitations period [runs] . . . *from and including* the day following the day of finality . . . *to and including*" "the anniversary of the date of finality" (emphasis in original)). January 2, 2021, fell

11

on a Saturday. Accordingly, under Rule 6 of the Federal Rules of Civil Procedure, "the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." *See* Fed. R. Civ. P. 6(a)(1)(C). Thus, Petitioner could timely file his petition up to and including January 4, 2021.

Petitioner did not initiate § 2254 proceedings until January 11, 2021,[1] one week after the limitations period expired. Thus, statutory tolling under § 2244(d)(2) fails to render Petitioner's § 2254 petition timely filed.[2]

---

[1] The Court has given Petitioner the most favorable filing date possible. January 11, 2021—the date Petitioner signed the "petition," (ECF No. 1, PageID.4)—as a proxy for the date it was provided to prison authorities. Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). Furthermore, the date the prisoner signs the document is deemed the date he handed it over to prison authorities. *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)). Here, however, the date Petitioner signed the petition should not be deemed the filing date. Another letter Petitioner filed along with his submission was signed on January 12, 2021; thus, Petitioner could not have given his materials to prison authorities for mailing before January 12, 2021.

[2] Although Petitioner, through counsel, returned to the trial court and filed a successive Rule 6.500 motion on June 6, 2021 (ECF Nos. 17-13, 17-14), that motion neither tolls nor restarts the one-year limitations period. The tolling provision does not "revive" the limitations period; it does not "restart the clock . . . it can only serve to pause a clock that has not yet fully run." *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (internal quotation marks omitted). When the limitations period has expired, "collateral petitions can no longer serve to avoid a statute of limitations." *Id.*

Moreover, the trial court denied Petitioner's successive Rule 6.500 motion under Michigan Court Rule 6.502(G). (ECF No. 17-15, PageID.2099.) The United States Court of Appeals for the Sixth Circuit has held that a collateral attack denied under Rule 6.502(G) is not properly filed for purposes of statutory tolling. *See Williams v. Birkett*, 670 F.3d 729, 733–36 (6th Cir. 2012); *see also Kares v. Morrison*, 77 F.4th 411, 418 (6th Cir. 2023) (reaffirming *Williams*' vitality). Thus, even if Petitioner's successive Rule 6.500 motion was filed within the one-year limitations period, it would not toll the running of that period.

### B.      Equitable Tolling

The one-year limitations period is also subject to equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 645 (2010). A petitioner bears the burden of showing that he is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). The Sixth Circuit repeatedly has cautioned that equitable tolling relief should be granted "sparingly." *See, e.g.*, *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011), *Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006); *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005); *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). A petitioner seeking equitable tolling must show: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

As noted above, in an opinion and order (ECF Nos. 8, 9) entered on March 25, 2021, the Court directed Petitioner to show cause as to why his § 2254 petition should not be dismissed as untimely. The Court received Petitioner's show cause response (ECF No. 10) on April 20, 2021. In that response, Petitioner contended that the effects of the COVID-19 pandemic should serve to equitably toll the limitations period. Petitioner states that URF went into lockdown status in the middle of 2020 because of the virus. (*Id.*, PageID.195.) Petitioner, as well as his entire unit, were afflicted by the virus at some point. (*Id.*, PageID.196.) He contends that he was moved to an isolation unit and separated from his property and legal work. (*Id.*) Petitioner avers that the virus made him "extremely sick," and that he "was render[ed] useless" from debilitating headaches. (*Id.*) Petitioner was "unable to think, focus[,] or process much of anything", and he had "difficulties getting in and out of bed." (*Id.*) Overall, Petitioner suggests that his "cognitive skills took a serious hit: the possibility of [him] trying to mentally or physically navigate . . . through the federal process was next to impossible." (*Id.*) Petitioner acknowledges that he asked other inmates to assist him, but that they had no access to the law library. (*Id.*)

13

Petitioner asserted some of his allegations concerning COVID-19 in his initial submission as well. In that submission, Petitioner explained that he was COVID-19 positive and that his unit had been on lockdown for several weeks. (ECF No. 1-1, PageID.8.) Petitioner explained that he could not get to the law library, nor did have access to a typewriter. (*Id.*) Petitioner explained that he filed his motion seeking the stay and abeyance because he wanted to submit something "before [his] deadline." (*Id.*) Conspicuously absent from Petitioner's response are any specific dates that fix in time when the COVID-19 virus precluded Petitioner's preparation of his habeas petition.

Respondent contends that Petitioner's general allegations concerning the COVID-19 virus and its effects do not warrant equitable tolling of the limitations period. (ECF No. 16, PageID.702–704.) This Court agrees. Notably, Petitioner did not file a response to Respondent's motion to dismiss and so has failed to counter Respondent's argument against equitable tolling. Nor has Petitioner responded to the Court's invitation to provide such dates to permit the Court to assess whether equitable tolling is appropriate. (Order, ECF No. 11, PageID.209.) In any event, while the Court is sympathetic to the fact that Petitioner contracted COVID-19 and experienced symptoms from the virus, Petitioner fails to demonstrate that he acted diligently during the one-year limitations period.

First, as noted above, the limitations period began to run on January 4, 2020. While Petitioner states that URF was placed on lockdown in the middle of 2020, Petitioner fails to explain why he was prevented from filing his § 2254 petition in the months that passed between January 4, 2020, and when URF entered lockdown status. Petitioner's general allegations concerning the COVID-19 virus and the ensuing lockdown, including closure of the law library, simply do not suffice to demonstrate that Petitioner is entitled to equitable tolling of the limitations period. *See, e.g.*, *Salyers v. Robey*, No. 22-5319, 2022 WL 19575893, at *2 (6th Cir. Aug. 11, 2022) (affirming

14

the dismissal of the petitioner's § 2254 petition as untimely and noting that he was not entitled to equitable tolling because of the COVID-19 pandemic because it had failed to show that the effects of the pandemic were "significant enough to prevent him from filing a timely federal petition"); *Jones v. United States*, 689 F.3d 621, 627 (6th Cir. 2012) (noting that limited access to a law library generally does not give rise to equitable tolling); *United States v. West*, 578 F. Supp. 3d 962, 967 (N.D. Ohio 2022) (noting that the petitioner's "vague and generalized contentions" about COVID-19-related law library restrictions "[did not] begin to demonstrate that the impact of the COVID-19 pandemic interfered with his ability to file" his habeas petition); *Schoening v. Christianson*, No. 2:21-cv-11955, 2021 WL 4290242, at *3 (E.D. Mich. Sept. 21, 2021) (noting that while the COVID-19 pandemic "is an extraordinary circumstance," the petitioner's conclusory allegations did not suffice to demonstrate that he diligently pursued his rights to entitle him to equitable tolling); *Taylor v. Valentine*, No. 5:20-cv-139, 2021 WL 864145, at *3 (W.D. Ky. Mar. 8, 2021) (concluding that the petitioner was not entitled to equitable tolling because he failed to show how the COVID-19 pandemic limited his ability to timely file his petition); *Mahan v. Steward*, No. 1:21-cv-90, 2021 WL 776989, at *1–2 (W.D. Mich. Mar. 1, 2021) (concluding same).

Moreover, Petitioner fails to supply any information as to when he contracted COVID-19 and experienced symptoms from the virus. Respondent contends that "[t]o the extent that [Petitioner] claims the coronavirus rendered him temporarily mental[ly] incompetent, he is not entitled to equitable tolling." (ECF No. 16, PageID.704.) Again, this Court agrees with Respondent. To be entitled to equitable tolling on the basis of mental incompetence or impairment, the petitioner must show that he or she was mentally or physically impaired and that the impairment was the cause for the late filing. *Ata*, 662 F.3d at 742; *see also Plummer v. Warren*, 463 F. App'x 501, 506 (6th Cir. 2012) ("Illness—mental or physical—tolls a statute of limitations

only if it actually prevents the sufferer from pursuing his [or her] legal rights during the limitations period."). "[A] blanket assertion of mental incompetence is insufficient to toll the statute of limitations. Rather, a causal link between the mental condition and untimely filing is required." *Ata*, 662 F.3d at 742.

As set forth above, Petitioner claims that, after contracting COVID-19, he had debilitating headaches and states that he was "render[ed] useless." (ECF No. 10, PageID.196.) Petitioner avers that he was "unable to think, focus[,] or process much of anything." (*Id.*) His "cognitive skills took a serious hit: the possibility of [him] trying to mentally or physically navigate [himself] through the federal process was next to impossible." (*Id.*) Petitioner, however, fails to explain how long these symptoms lasted. Moreover, as noted above, Petitioner's limitations period began on January 4, 2020, and he fails to set forth when he contracted COVID-19. Moreover, Petitioner acknowledges that he sought assistance from fellow inmates during this time. (*Id.*) Petitioner's own assertions are simply insufficient to demonstrate that a mental impairment or incompetence impaired his ability to file his § 2254 petition in a timely manner. *See, e.g.*, *Nichols v. Davis*, No. 2:24-cv-10543, 2024 WL 2138629, at *3 (E.D. Mich. May 13, 2024) (rejecting similar equitable tolling argument and dismissing petition as untimely); *Jenkins v. Burgess*, No. 21-cv-12960, 2022 WL 1212132, *5 (E.D. Mich. Apr. 25, 2022) (same), *see also McSwain v. Davis*, 287 F. App'x 450, 457–458 (6th Cir. 2008) ("Speculation about the impact of mental illness on the ability to timely file a habeas petition is not sufficient to warrant an evidentiary hearing.").

Furthermore, as the Court has already explained to Petitioner, there is no requirement that a habeas petition be typewritten, and the habeas petition form does not require any legal argument. Instead, "Petitioner is asked only to recount the procedural history and identify the issues he raised in the state courts and now offers as grounds for habeas relief in this Court." (ECF No. 8,

PageID.191.) Despite not having access to a law library, Petitioner was able to do just that in his initial submission and amended § 2254 petition. (Pet., ECF No. 1; Am. Pet., ECF No. 7.) Petitioner fails to explain how the lockdown and closure of the law library because of the COVID-19 virus impeded him from completing the habeas form during the limitations period.

Finally, Petitioner appears to suggest that the Michigan Supreme Court recognized the fact that COVID-19 posed an extraordinary problem by extending deadlines for filing during the pandemic. (ECF No. 10, PageID.195.) The Michigan Supreme Court's administrative order in question "allowed prisoners to file a place-holding letter in the Michigan Court of Appeals or Michigan Supreme Court, informing the court of the intent to file an appeal, and it provided for tolling of the appeal deadline because of prison restrictions related to COVID-19." *See Schoening*, 2021 WL 4290242, at *3 (citing Michigan Supreme Court Administrative Order No. 2020-21). The supreme court's administrative order, however, had no effect on the one-year limitations period applicable to § 2254 petitions under AEDPA. Moreover, ignorance of the law does not justify tolling. *See Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 464 (6th Cir. 2012); *Rodriguez v. Elo*, 195 F. Supp. 2d 934, 936 (E.D. Mich. 2002) (noting that the law is "replete with instances which firmly establish that ignorance of the law, despite a litigant's pro se status, is not excuse" for failure to file legal requirements such as filing deadlines).

In sum, for the reasons set forth above, the Court concludes that Petitioner has failed to demonstrate that he is entitled to equitable tolling to render his § 2254 petition timely.

### C.    Actual Innocence

In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court held that a habeas petitioner who can show actual innocence under the rigorous standard of *Schlup v. Delo*, 513 U.S. 298 (1995), is excused from the procedural bar of the statute of limitations under the miscarriage-of-justice exception. In order to make a showing of actual innocence under *Schlup*, a petitioner

must present new evidence showing that "it is more likely than not that no reasonable juror would have convicted [the petitioner.]" *McQuiggin*, 569 U.S. at 399 (quoting *Schlup*, 513 U.S. at 327) (addressing actual innocence as an exception to procedural default). The showing must be based on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Because actual innocence provides an exception to the statute of limitations rather than a basis for equitable tolling, a petitioner who can make a showing of actual innocence need not demonstrate reasonable diligence in bringing his claim, though a court may consider the timing of the claim in determining the credibility of the evidence of actual innocence. *Id.* at 399–400.

In his April 20, 2021, response to the Court's opinion and order directing him to show cause, Petitioner asserts that he "recently came in possession of some newly discovered evidence that has the potential to exonerate [him]." (ECF No. 10, PageID.199.) Specifically, Petitioner references an affidavit from inmate Jamel King as the newly discovered evidence. (*Id.*, PageID.200.) According to Petitioner, this affidavit shows that King, not Petitioner "is the guilty party." (*Id.*)

In his affidavit, King states that six months prior to when he signed the affidavit (April 1, 2021), he read a news article concerning Traverse City Narcotics Officer Sergeant Randy Graham, who was being sued for misconduct in a drug case. (ECF No. 10-1, PageID.203, ¶ 1.) Sergeant Graham had been involved in King's case, so King "decided to check the computer in the law library and find the reasons for the lawsuit." (*Id.* ¶ 2.) King came across Petitioner's case, and while reading the case, King realized that the Nergs "had lied in their testimony." (*Id.* ¶ 3.) King avers that the Nergs lied because they "worked exclusively for [King] and [his] partner (White Boy) from 2014 to early 2015." (*Id.* ¶ 4.) King states that White Boy "set them up in a hotel[;] he

supplied them with drugs and gave them everything that [they] needed to [sell] the drugs." (*Id.*) King contends that the Nergs "could never work for anyone else because[] that causes problems. They consistently had our drugs, so there was never an opportunity for them to get drugs from anyone else." (*Id.*, PageID.203–204, ¶ 5.)

King goes on to state that when he was first interviewed by Sergeant Graham, "this information about Alicia and Brian Nerg being my exclusive drug runners was discussed." (*Id.*, PageID.204, ¶ 6.) Sergeant Graham told King that "his squad was already aware of the Nergs selling drugs exclusively for [King] but they were not concerned about it, Randy Graham said that their only concern was any information that [King] could give them about Norfleet[, also known as Twin]." (*Id.*)

King avers further that Angela Bembeneck was a daily customer of White Boy, and that when she "came to town" she only bought drugs from King and White Boy "via telephone." (*Id.* ¶ 7.) King avers that her testimony that she purchased drugs from Petitioner via the Nergs is "blatantly false." (*Id.*) King states that he wrote the Traverse City prosecutor with this information on two separate occasions, but had not received a response as of the date of his affidavit. (*Id.* ¶ 8.)

As noted *supra*, while this case was stayed, Petitioner returned to the trial court and filed a successive Rule 6.500 motion asserting his claim of actual innocence based upon King's affidavit. The trial court denied Petitioner's motion in a short order. The trial court concluded that King's affidavit was not credible and that Petitioner "ha[d] failed to establish the proposed testimony would make a different result probable on retrial." (ECF No. 17-15, PageID.2099.) Moreover, "King's claims [were] essentially cumulative to "claims made by Shaun Sabourin, a defense witness, at trial. (*Id.*) Specifically, the trial court wrote:

> On December 12, 2018, Jamel King was sentenced to serve five to 20 years with the Michigan Department of Corrections (MDOC) and is currently incarcerated at

Chippewa Correctional Facility. King has a total of nine felony convictions, including two crimes involving deception. King has been described by a former parole agent as "extremely manipulative." While King claims that Brian and Alisha Ner[g] worked exclusively for him from 2014 to early 2015, the evidence presented at trial contradicts this assertion. Bryan Nerg testified that in June of 2014 he "started selling heroin" for [Petitioner]. When Nerg needed more heroin, he would call [Petitioner] and [Petitioner] would resupply him. In the fall of 2014, Nerg was getting his supply of heroin from [Petitioner] and testified that he never got heroin from any other supplier during this time period. In January and February of 2015, Nerg was meeting [Petitioner] once or twice a day to resupply and drop off money. Alisha Nerg testified that [Petitioner] would provide heroin and then "he would call and have us deliver to different people." She also discussed meeting [Petitioner] in a black jeep, giving him money and receiving heroin. Furthermore, other witnesses at trial provided corroborating evidence that [Petitioner] delivered, manufactured and/or possessed heroin. Law enforcement recovered cash, narcotics packaging material and a drug scale from [Petitioner's] house. A drug sniffing dog indicated the presence of narcotics in the home. Desseray Schaffer, [Petitioner's] ex-girlfriend, testified to flushing narcotics down the toilet before the search warrant was executed on February 14, 2015, and confirmed that the Nergs worked for [Petitioner]. Lastly, Shaun Sabourin, who was incarcerated with Bryan Nerg, testified for the defense that Nerg told him he had been working or selling drugs for "a couple other people" in town and said he barely knew [Petitioner]. Sabourin suggested that Nerg had provided false testimony and lied under oath. The jury clearly rejected Sabourin's testimony when they convicted [Petitioner] of all charges.

(*Id.*, PageID.2098.)

Upon consideration of the record, the Court agrees with Respondent that King's affidavit does not suffice to prove actual innocence to allow Petitioner to overcome the procedural bar of the statute of limitations. As an initial matter, King signed his affidavit on April 1, 2021, almost six years after Petitioner was convicted. Long-delayed affidavits, especially ones that seek to shift the blame for the crime to another individual, are "treated with a fair degree of skepticism." *Herrera v. Collins*, 506 U.S. 390, 423 (1993). As the trial court noted, King is currently an inmate with the MDOC. According to the MDOC's Offender Tracking Information System (OTIS), King is currently serving a five-to-20-year sentence imposed by the Grand Traverse County Circuit Court after King pleaded guilty to two counts of delivery/manufacture of narcotics, as well as a 3-to-10-year sentence imposed by the Wayne County Circuit Court after King pleaded guilty to

20

assault with intent to commit great bodily harm less than murder. *See* https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=353515 (last visited July 23, 2024). Affidavits from fellow inmates prepared after trial are not sufficiently reliable to support a finding of actual innocence. *See Milton v. Sec'y, Dep't of Corr.*, 347 F. App'x 528, 531–32 (11th Cir. 2009).

Although King states that he did not learn about Petitioner's case until, at the earliest, November of 2020, he still did not prepare his affidavit until six months later. King's failure to come forward in a timely manner and to disclose the allegedly exculpatory information to police further undermines his credibility. *See Ashmon v. Davis*, 508 F. App'x 486, 488 (6th Cir. 2012).

The timing of King's affidavit is also suspect given his assertion that the Nergs exclusively worked for him selling drugs during the relevant time period. It defies belief that if that were true, King would not have learned well before 2021 that they had testified on behalf of the prosecution in Petitioner's case. In fact, Bryan Nerg testified that he entered into a plea agreement that he would plead guilty to one count of delivery of heroin and the other charges would be dropped. (Trial Tr. I, ECF No. 17-4, PageID.1040.) Part of the agreement was that he would also not be prosecuted for other heroin deals that he had participated in and disclosed to the prosecution. (*Id.*) Alysha Nerg testified similarly—that in exchange for her testimony in Petitioner's case, her charges would be "dropped down to a lower charge." (*Id.*, PageID.1075.) Alysha Nerg testified that she pleaded guilty to delivery of a nonnarcotic. (*Id.*) A publicly available newspaper article indicates that Alysha was sentenced to six months in jail, and Bryan was sentenced to 23 months to 20 years in prison. *See* "Detroit Man Found Guilty in Grand Traverse County for Drug Related Crimes," *available at* https://upnorthlive.com/news/local/detroit-man-found-guilty-in-grand-traverse-county-for-drug-related-crimes (last visited July 23, 2024). Given the fact that the Nergs

both spent time incarcerated, King certainly would have known that he had lost two of his alleged "exclusive employees" long before 2021.

King's affidavit relies upon nothing but his own belief that the Nergs were working exclusively for him and that Bembeneck only bought heroin from him. However, as the court of appeals noted, law enforcement officers testified that the "controlled buy" funds that they provided to Bembeneck after she agreed to be a confidential informant were found in Petitioner's residence. *See Norfleet*, 897 N.W.2d at 199–200. Bembeneck had used those funds to purchase heroin from Alysha Nerg. *Id.* If Bembeneck had been exclusively buying heroin from King, then King would have ended up in possession of the "controlled buy" funds, not Petitioner. King's affidavit simply fails to provide any explanation for how, if the facts as set forth by him are true, the funds ended up at Petitioner's residence.

To be entitled to rely upon actual innocence to overcome the statute of limitations bar, a petitioner "must produce evidence of innocence so strong that the court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Allen*, 366 F.3d at 405 (internal quotation marks and citations omitted). King's affidavit does not rise to that level. Because the trial court considered Petitioner's claim of actual innocence on the merits, the Court must give deference to that decision under AEDPA. As the trial court thoroughly stated, King's affidavit is cumulative of testimony provided by Shaun Sabourin at trial. Sabourin testified that at one point, he shared a cell with Bryan Nerg. (Trial Tr. IV, ECF No. 17-7, PageID.1797.) Sabourin testified that Nerg told him that he was "willing to do whatever he had to do to get out of jail," including "lie or say whatever he had to say to get out." (*Id.*, PageID.1799.) According to Sabourin, Nerg told him that he "barely knew [Petitioner]." (*Id.*) He also allegedly told Sabourin that he "had been working or selling drugs for a couple other

people here in town." (*Id.*, PageID.1800.) Sabourin's testimony undercuts King's assertion that the Nergs were working exclusively for him. In any event, had the jury believed Sabourin's testimony, they would have found the Nergs to be not credible and Petitioner would have been acquitted. However, by convicting Petitioner, the jury clearly found Sabourin to be not credible.

In short, Petitioner's new evidence, in the form of King's affidavit, does not suffice to demonstrate that "it is more likely than not that no reasonable juror would have convicted" Petitioner. *McQuiggin*, 569 U.S. at 399 (quoting *Schlup*, 513 U.S. at 327). King's affidavit is simply not trustworthy enough for this Court to conclude that Petitioner can rely upon actual innocence to overcome the bar imposed by the statute of limitations.

### D.      Other Limitations Period Commencement Dates

While Petitioner's § 2254 petition is untimely under § 2244(d)(1)(A), that "subsection . . . provides one means of calculating the limitation with regard to the 'application' as a whole . . . judgment, but three others . . . require claim-by-claim consideration." *Pace*, 544 U.S. at 416 n.6. Petitioner provides no assertions that he was impeded from filing his § 2254 petition by State action, nor does he rely upon a new right made retroactively applicable to cases on collateral review. Thus, §§ 2244(d)(1)(B) and 2244(d)(1)(C) do not apply.

Respondent contends that Petitioner cannot rely upon § 2244(d)(1)(D) to render his § 2254 petition timely filed. As set forth above, that subsection provides that the limitations period commences on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." To the extent that Petitioner contends that he could not have discovered the factual basis for grounds XIII through XV until he received Jamel King's affidavit, he has not established that he exercised due diligence in discovering the factual basis for those claims. Nowhere does Petitioner establish when he actually became aware of King, King's statement, and the information contained within King's affidavit. As set forth

above, the affidavit was signed by King on April 1, 2021, and he attests that he learned of Petitioner's case six months prior.

In any event, Petitioner fails to set forth any explanation regarding how the factual predicate of his newly discovered evidence claims could not have been discovered earlier, nor does he indicate what steps, if any, he took to discover these claims. As discussed above, Sabourin testified for the defense that Nerg claimed to sell drugs for other people and barely knew Petitioner. Petitioner could have exercised due diligence before trial and asked counsel to discover who these other individuals were, but did not do so. Moreover, if, as stated in the affidavit, the Nergs worked exclusively for King, Petitioner certainly would have been aware of that fact well before trial. Petitioner, therefore, cannot rely upon § 2244(d)(1)(D) to render grounds XIII through XV timely.

### E.    One Week Late

It may seem a harsh result that just 7 days makes the difference between allowing or barring habeas review, but that is the nature of statutes of limitation. The Supreme Court made that point clearly in *United States v. Locke*, 471 U.S. 84 (1985):

> The notion that a filing deadline can be complied with by filing sometime after the deadline falls due is, to say the least, a surprising notion, and it is a notion without limiting principle. If 1-day late filings are acceptable, 10-day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline; yet regardless of where the cutoff line is set, some individuals will always fall just on the other side of it. Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced. "Any less rigid standard would risk encouraging a lax attitude toward filing dates," *United States v. Boyle*, 469 U.S. [241,] 249 [(1984)]. A filing deadline cannot be complied with, substantially or otherwise, by filing late—even by one day.

*Locke*, 471 U.S. at 100–01.

For all of the reasons set forth above, the Court concludes that Petitioner cannot overcome the tardy filing of his § 2254 petition. Accordingly, the petition is properly dismissed as untimely, and Respondent's motion to dismiss is properly granted.

## III.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.*

The Court has concluded that Petitioner's § 2254 petition is untimely. Under *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), when a habeas petition is denied on procedural grounds, a certificate of appealability may issue only "when the prisoner shows, at least, [1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Both showings must be made to warrant the grant of a certificate. *Id*.

The Court finds that reasonable jurists could not find it debatable whether Petitioner's § 2254 petition should be dismissed as untimely. Therefore, a certificate of appealability will be denied. However, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter an order and judgment granting Respondent's motion to dismiss (ECF No. 16), dismissing Petitioner's § 2254 petition as untimely, and denying a certificate of appealability.


Dated:    July 29, 2024                      /s/ Robert J. Jonker
                                             Robert J. Jonker
                                             United States District Judge